IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| J.P., a minor by her guardian ad litem RICARDO BALDERAS, et al., | ) ) ) | 1:09-CV-1538  AWI DLB |
| Plaintiffs, | ) ) | ORDER ON DEFENDANTS' MOTION FOR SUMMARY |
| v. | ) ) | JUDGMENT |
| CITY OF PORTERVILLE, et al., | ) ) | (Doc. No. 37) |
| Defendants. | ) ) | |

        This civil rights lawsuit arises from a fatal shooting involving members of the City of

Porterville Police Department and decedent Eusebio Prieto ("Prieto").  Natalie Prieto and minors

J.P., R.B, and S.B., who are all relatives of Prieto, filed suit in this Court against the City of

Porterville ("the City"), Sergeant John Hall ("Hall"), Sergeant Jeff Dowling ("Dowling"),

Sergeant Larry Rodriguez, and Chief Chuck McMillan.  The active complaint is the Second

Amended Complaint ("SAC").  Plaintiffs allege state law claims for negligence and battery, and

claims under 42 U.S.C. § 1983 for violation of the Fourth Amendment (excessive force) and

Fourteenth Amendment (familial relationship) and *Monell* liability.  Defendants now move for

summary judgment.  For the reasons that follow, Defendants' motion will be granted, and the

Clerk will be directed to close this case.

# FACTUAL BACKGROUND[1]

On July 24, 2008, sometime in the late morning, Prieto drove his vehicle at an estimated 80 m.p.h. directly towards on-coming traffic.[2]  DUMF 1; SAC ¶ 17.  Prieto was driving towards City police officer Kris Contreras ("Contreras").  See Contreras Depo. 18:7-8.  Contreras was in an unmarked police vehicle that had lights and a siren.  See Contreras Depo. 16:7-16.  Prieto swerved his car, causing it to hit the curb where it sustained damage, including two popped tires.  See id. at 19:20-25.  Contreras turned his lights and siren on, turned his car around, and followed Prieto's vehicle.  See id. at 21:5-15.  Contreras got on the radio and broadcasted that a vehicle had almost hit him head-on and was traveling eastbound in a westbound lane at a high rate of speed.  See id. at 20:5-18.  Hall heard Contreras on the radio, and recalled that Contreras said that he was in pursuit and attempting to stop a car that had "tried to take him head-on."  See Hall Depo. 15:6-10.  Prieto's vehicle came to a stop about a half mile after passing Contreras due to what Contreras perceived to be mechanical failure.  See Contreras Depo. 19:19-25.  Prieto's vehicle was near a Foster Farm's plant.

Contreras drew his gun and ordered Prieto to exit the vehicle.  See id. at 25:24-26:14.  Prieto armed himself with a screwdriver and exited his vehicle.  See DUMF 2.  Ignoring commands to "stop" and to "drop your weapon," Prieto lunged or "jabbed forward" at Contreras with the screwdriver.  See DUMF 3; Padilla Depo. 24:6-14.  Contreras backed away from Prieto.  See DUMF 4.  Ignoring commands, Prieto yelled "shoot me, kill me."  See DUMF 5.  Eventually Prieto ran from Contreras towards civilians and the Foster Farms parking lot, and other police officers began to arrive with their sirens on.  See Padilla Depo. 28:14-29:11.  Contreras opined that Prieto could not move very fast, in part because Prieto was heavy set, and characterized Prieto's top speed as "barely moving" because of Prieto's size.  See PAMF's 49-50.

---

[1]"DUMF" is "Defendants' Undisputed Material Fact," and "PAMF" is "Plaintiffs' Additional Material Fact."  Also, there are numerous objections made to the proposed facts.  Unless otherwise explained in more detail, a citation to evidence or a DUMF or a PAMF indicates that any objections made thereto are overruled.

[2]The parties do not provide a precise time frame for the shooting.  However, Hall testified that the transaction occurred during "business hours," and Foster Farms employee Claudia Ramos testified that the events occurred close to lunch time.  See Hall Depo. 79:15-16; Ramos Depo. 37:4-8.

Contreras informed Hall and Dowling (who had arrived) that Prieto had charged or "come at" him with a screwdriver.  See DUMF 7; Contreras Depo. 42:25-43:4.  Hall, Dowling, and Contreras pursued Prieto on foot.  PAMF 24.  The officers followed Prieto into the Foster Farms parking lot, and Contreras radioed dispatch to contact Foster Farms and tell them to "lock down."  See Contreras Depo. 44:17-25.  All three officers had their guns drawn.  PAMF 31.  In the parking lot, Prieto repeated to the officers, "you're going to have to kill me or just shoot me," and then Prieto stabbed himself in the neck with the screwdriver.  See Hall Depo. 32:7-33:3; DUMF's 8, 9.  After seeing this behavior, Hall radioed dispatch to send an officer with a Taser weapon.  See PAMF 29; Hall Depo. 33:4-8.

Prieto and the officers continued walking through the parking lot and the officers were telling him that they were the police, to stop, to drop the weapon, and not to move, but Prieto kept going through the parking lot, stabbed himself in the neck "a couple more" times, and said that the officers would have to shoot or kill him.  See Hall Depo. 33:17-34:3.  Prieto's neck was bleeding heavily.  See PAMF 32.  Hall believed that Prieto was acting like he was "crazy" or under the influence of drugs, see Hall Depo. 49:7-11, and Dowling believed that Prieto's behavior may be due to the use of a stimulant like methamphetamine or cocaine.[3]  See Dowling Depo. 10:13-19.

Prieto began walking down a sidewalk as the officers moved to a grassy area near Prieto.  See PAMF 35.  The officers told Prieto to stop, that they were police officers, to don't go any further, and to drop the screwdriver.  See Hall Depo. 36:8-11.  However, Prieto did not comply and continued to head towards the front of the Foster Farms building while stabbing himself and saying that the officers were going to have to shoot him or kill him.  See id. at 36:13-18.  Hall positioned himself between Prieto and the door of the Foster Farms building.  See id. at 36:19-37:7.  Hall wanted to prevent Prieto from getting inside where employees would be, and he wanted to try to change Prieto's direction back to the parking lot.  See id. & 56:12-22.  At some point, City police officers John Benas ("Benas"), Rick Carrillo ("Carrillo"), and Mark Lightfoot

---

[3] Toxicology reports confirmed the presence of methamphetamine in Prieto's system.  See DUMF 11; Hartman Depo. 87:20-89:23; cf. Boyd v. City & County of San Francisco, 576 F.3d 938, 944 (9th Cir. 2009).

1   ("Lightfoot") arrived on the scene.

2          The officers continued to give commands to Prieto.  <u>See</u> Hall Depo. 52:4-9 ("We were

3   giving him commands the entire time. . . . Commands were continuous pretty much from the

4   moment we got out of the car all the way up to the very end.").  It appeared to Carrillo that Prieto

5   was not "paying attention" to the officers and was in "sort of a daze."  <u>See</u> Carrillo Depo. 9:10-

6   14.  Prieto advanced on Hall with the screwdriver raised.  <u>See</u> Hall Depo. 49:4-14, 55:10-17;

7   Benas Depo. 33:4-34:12.  Hall explained:

8          He starts to come towards me, and I don't know if he's coming towards me to
           attack me with the screwdriver, or if he's trying to go over the top of me to get . . .
9          inside and attack someone inside.  He had already been plunging that screwdriver
           in his neck.  His mannerisms, he was acting like he was either under the influence
10         of drugs, he was acting crazy, and he's obviously extremely dangerous, and he
           starts to come forward to me, and at that point I felt like he was either going to kill
11         me, or get inside and kill somebody in there.  So, I fired.

12  Hall Depo. 49:4-14.  At the time that Prieto turned towards Hall, Lightfoot perceived that Prieto

13  posed a threat to Hall.  <u>See</u> Lightfoot Depo. 15:7-11, 16:3-10.  Hall was approximately 8 to 10

14  feet away from Prieto at the time Hall fired this shot.[4]  <u>See</u> DUMF 13.  Although Prieto was not

15  running at Hall at the time of the shot, Prieto was advancing on Hall.  <u>See</u> PAMF 47; Hall Depo.

16  54:16-55:17.[5]  The single shot caused Prieto to momentarily pause, hunch/slump over, and then

17  continue walking in another direction.  <u>See</u> PAMF 61; Hall Depo. 53:3-8.  Hall did not fire a

18  second shot because Prieto's forward movement stopped, and Hall believed that Prieto was no

19  longer trying to get into the business and was no longer an immediate threat to Hall.  <u>See id.</u> at

20  ――――――――――――――――

21         [4]Relying on PAMF 54, Plaintiffs contend that Hall was about 2 feet in front of Dowling at the time of this
    shot.  PAMF 54 relies on a single excerpt from Dowling's deposition.  However, the Dowling deposition excerpt is
22  actually referring to different shots fired by Hall.  <u>See</u> Dowling Depo. 26:1-28:25, 31:19-32:21.

23         [5]Plaintiffs contend that at the time of this shot by Hall, Prieto never made any aggressive gestures towards
    the officers.  Plaintiffs rely exclusively on PAMF 38, which in turn is supported only by the deposition testimony of
24  William Linley, a Foster Farms employee.  However, it is unclear when Linley actually began observing Prieto and
    the officers.  Linley testified that he was standing outside of the guard shack, he tried to close the gate, he was told to
25  get inside, and then he "did a 180" back to the guard shack where he went inside and locked the door.  <u>See</u> Linley
    Depo. 15:6-16:17.  Prieto then went through the gate and passed the guard shack.  <u>See</u> Linley Depo. 16:14-20, 17:8-
26  16.  Critically, Linley testified that he did not see or hear gunshots at any time prior to Prieto reaching the gate/guard
    shack.  <u>See id.</u> at 16:21-17:7.  This shot by Hall occurred before Prieto reached the gate/guard shack.  Linley's
27  testimony is insufficient to establish that he observed Prieto at the time Hall fired this shot because (1) it is not clear
    that Linley's testimony deals with the relevant time frame, (2) Linley "did a 180" back to the guard shack and away
28  from Prieto and the officers, and (3) Linley's testimony affirmatively demonstrates that he neither saw nor heard
    Hall's gunshot.  <u>See</u> Linley Depo. 15:6-17:16, 35:1-37:1.  As to this shot by Hall, PAMF 38 is not established.

                                                      4

54:5-12.  Both before and after Hall's shot, Prieto was injuring himself with the screwdriver.  See PAMF 41.

Prieto continued walking and went through an opening in a gate that was next to a guard shack.  See PAMF's 64, 65; Hall Depo. 75:6-15, 77:2-4; Linley Depo. 17:8-16.  William Linley, a Foster Farms employee, was inside the guard shack.  See Linley Dep. 16:14-17.  As Prieto walked passed the guard shack, Prieto and Linley were face to face through the guard shack window.  See id. at 17:11-16.  When Linley saw Prieto "face to face," Linley felt "real fear."  See id.  Linley explained that he was afraid for Prieto and for anyone who came into contact with Prieto because Prieto looked like someone who was not himself and "had a look of extreme anger" or who was "out of his mind."  Id. at 18:6-14.  Linley stated that the expression on Prieto's face indicated an intention of expressing anger in some fashion, and even if the intention was not to hurt someone, Prieto looked like he could do so.  See id. at 18:17-22.  Nevertheless, Prieto passed by the guard shack without attempting to open the door or window, and entered a courtyard area.  See PAMF's 65-66.[6]

In the courtyard, Prieto passed several doors without trying to enter, including some that had people standing behind them.  See PAMF 71.  Prieto stopped at a set of double doors, which led to an employee break room.[7]  See Linley Depo. 24:4-8.  At that time of day, there could have been as many as 50 employees in the break room, and the doors were unlocked.  See id. at 15:19-16:8, 23:14-16; Ramos Depo. 36:10-12.  Contreras testified that, by the time Prieto reached the double door area, Prieto looked tired, "[a]mong a lot of other things."  See Contreras Depo. 67:1-3.  Also, around the time that Prieto entered the courtyard, officer Robert Craig arrived on the scene and joined the other officers.  See PAMF 70.  Craig arrived with a bean bag shotgun because he knew that a request for less lethal options had been made when he heard the request

---

[6]It was Benas's "belief" that Prieto went this way because it was the only direction in which officers were not impeding his travel.  See Benas Depo. 36:16-25.

[7]There was actually a second set of double doors beyond the first set where Prieto was.  See PAMF 80.  The first double door had light tint and led to the break room.  See id. at 24:4-8.  Prieto was at the first set of double doors with the light tint.  See Linley Depo. 24:4-8.  The doors open both inward and outward.  See id. at 20:11-13.  Nearby was another set of double doors that had a heavier tint, and that led to the reception and executive offices area.  See id. at 23:19-24:17.

for a Taser over the radio.  See PAMF 68.

In the Foster Farms reception area, receptionist Claudia Ramos heard someone yell "lock the doors," and she looked out the window towards the courtyard and saw a man enter the courtyard through the gate while being pursued by other men with guns.  See Ramos Depo. 10:10-16, 12:3-13:25.  Ramos later recognized Prieto as a former Foster Farms employee.  See id. at 14:12-16.   Ramos held the doors closed with the help of other employees, including Marty Weakley.  See Ramos Depo. 33:16-24; Weakley Depo. 21:16-25.  Weakley heard Prieto ignore multiple commands to stop, and was holding the door shut because, in his words, there were women in the reception area.  See Weakley Depo. 21:16-23:12.  Ramos testified that she kept holding the doors shut, even when she knew it was Prieto, because of the way Prieto looked and because of the officers' pursuit.  See Ramos Depo. 34:1-35:24.  Ramos and Weakley saw Prieto make his way to the double doors of the break room.  See Ramos Depo. 14:17-15:7; Weakley Depo. 20:23-21:2.  Weakley thought that Prieto was staggering and did not look coherent. See Weakley Depo. 19:25-20:4, 21:10-12.  Ramos testified that Prieto did not look angry, but looked unstable and had an expression that she had never seen before.[8]  See Ramos Depo. 33:3-15.  Ramos testified that they held the door shut, even when they recognized Prieto, because it was possible that Prieto would come to them and it looked "like [Prieto] was going to do something."  Id. at 34:1-18.  Ramos was afraid of Prieto.  See id. at 34:19-20.

At the double doors, the officers surrounded Prieto in a semi-circle.  See Lightfoot Depo. 19:2-9.  Hall, Benas, and Contreras could see people behind the double doors, but Craig, Dowling, and Carrillo did not see anyone through the tint of the double doors.[9]  See Benas Depo. 42:4-44:8; Carrillo Depo. 18:23-19:1; Contreras Depo. 65:5-66:25; Craig Depo. 46:16-21; Dowling Depo. 29:22-30:3; Hall Depo. 77:1-17.  However, Carrillo testified that in the course of the investigation, it was determined that there were employees behind the double doors in the

---

[8]Ramos was familiar with Prieto from his time at Foster Farms.  Ramos testified that she had seen Prieto angry on prior occasions, and that Prieto did not have that angry look on his face.  See Ramos Depo. 31:17-33:15.

[9]Additionally, Ramos (from the reception area) and Linley (from the guard shack) could not see if there were employees in the break room.  See Linley Depo. 24:24-25:2; Ramos Depo. 22:16-20.

6

1   break room.  See Carrillo Depo. 18:18-22.  Hall testified that he had concerns about Prieto

2   getting inside the double doors.  See Hall Depo. 79:21-80:8.  Hall explained: "Again, concern

3   being if he gets inside.  I know there's got to be people inside, and concern being if he gets inside

4   he's going to hurt somebody or kill somebody, and we can't let him get inside based on

5   everything he's been doing at that point."  Id. at 80:4-8.  The officers gave Prieto commands,

6   including to stop, to drop the screwdriver, and to not to go inside.  See id. at 80:3-4; Contreras

7   91:10-18; Maniss Depo. 17:12-18.  Linley testified that he heard an officer yell, "Stop.  Don't go

8   in there.  We'll shoot.  Don't go in there."  DUMF 16.  However, neither Hall, Dowling,

9   Contreras, nor Carrillo recall saying or hearing a warning that shots would be fired.[10]  See

10  Carrillo Depo. 15:5-8; Contreras 92:3-9; Dowling Depo. 31:1-15; Hall Depo. 82:19-25.  Prieto

11  ignored the commands.  See Hall Depo. 80:10.

12      Ramos (who was in the reception area) testified that Prieto did not get close enough to

13  open the double doors, but Prieto was reaching for the door.  See Ramos Depo. 22:8-15.

14  However, other witnesses, such as Weakley (who was also in the reception area) and Carrillo

15  testified that Prieto reached for the door handle, and the door jiggled or rattled, but did not open.

16  See PAMF 93; see also Benas Depo. 48:8-18 (Prieto touched and moved the door); Contreras

17  Depo. 85:22-86:4 (Prieto touched and moved the door); Craig Depo. 29:9-19 (Prieto touched and

18  moved the door); Hall Depo. 80:9-13 (Prieto started to pull the doors open); Linley Depo. 19:25-

19  20:7 (Prieto grabbed the handle, but cannot recall if the door ever opened).

20      When Prieto was near the door and began reaching for the handle, Craig and other

21  officers came up behind Prieto, and Craig announced, "bean bag, bean bag, bean bag."  See Craig

22  Depo. 28:1-8.  Prieto was just over an arm's reach from the door handle.  See id.  Yelling "bean

23  bag" communicated to other officers that Craig was about to discharge his bean bag shotgun.

24  See PAMF 82.  Lightfoot (who was a few feet away from Dowling) and Benas heard Craig yell

25  "bean bag," and Benas also began to yell "bean bag."  See PAMF's 85, 86.  The officers around

26  Craig made a subtle movement and provided Craig with a clear line of site to Prieto.  See Craig

27

28      [10]Dowling told another officer that he would shoot if Prieto went through the double doors.  See PAMF
    124.

Depo. 28:25-29:8.  However, Hall and Dowling did not hear anyone yell "bean bag," and Contreras has no recollection of hearing anyone yell "bean bag."  See Contreras Depo. 86:25-87:2; Dowling Depo. 27:2-4; Hall Depo. 73:8-12.  Also, about at this time, officer Joshua Maniss and his K-9 unit arrived and took a position about 7 to 8 feet from Prieto.  See Maniss Depo. 10:19-22.

According to Craig, once Prieto touched the door handle, Craig fired the bean bag shotgun.  See Craig 28:5-17.[11]  Craig fired four bean bag rounds in quick succession from a distance of about 10 feet, and hit Prieto three times.[12]  See PAMF 98; Craig Depo. 39:10-16. Craig believed that the second shot caused Prieto to turn around, and Craig continued to fire until he believed that Prieto had given up.  See Craig Depo. 39:10-40:21.  Also at the time that Hall saw Prieto touching the door handle, Hall testified that he fired his gun at Prieto between 4 and 5 times in order to prevent Prieto from entering the break room.  See Hall Depo. 79:24-80:18.  Hall fired in rapid succession.  See Hall Depo. 92:7-9.  Dowling was 2 to 3 feet from Hall when Hall fired.  See PAMF 121.  Dowling got in position and fired one shot after Hall had fired multiple shots.  See PAMF 117; Dowling Depo. 23:17-20.  Dowling testified that he believed that Prieto would be a danger to anyone in the building.  See id. at 23:9-23.  Dowling saw Hall firing and did not think that Hall's shots were having an effect on Prieto.  See Dowling Depo. 23:9-23, 25:10-16.  By the time Dowling fired, Prieto was starting to fall down, so Dowling did not believe that there was a need to fire more than the one shot.  See id. at 23:19-23.  Contreras testified that there were numerous shots fired and that he could not say when exactly Prieto went down, but Prieto did drop down sometime during the gun shots.  See Contreras Depo. 103:13-23; PAMF 116.  Craig testified that Prieto slumped down after Craig had fired his last shot, that is the fourth bean bag round.  See Craig Depo. 41:12-15.  Craig testified that Prieto did not drop quickly, but instead started to slump down.  See id. at 42:4-11.  Prieto died as a result of multiple

---

[11]Craig indicated that he began yelling "bean bag" when Prieto was at an arm's distance from the double doors's handle.  See Craig Depo. 28:5-17.  By the time Craig finished yelling, Prieto had moved the "arm's distance" and was touching the handle.  See id.

[12]The bean bag projectile is a nylon rectangular sack containing gel beads and is considered nonlethal. PAMF 100.

gun shot wounds.[13]  PAMF 136.

The precise sequence of the shots is unknown.  The sound of the bean bag shotgun is much louder and much more distinct than a handgun.  PAMF 113.  While Craig was firing the bean bag shotgun, he did not hear other shots being fired, and did not hear shots in the courtyard prior to his firing the bean bag shotgun.  See Craig Depo. 33:12-22, 43:12-15.  Contreras has no understanding of whether the handguns or the bean bag shotgun was fired first.  See Contreras 85:1-4.  In fact, Contreras testified that he did not know that Craig had fired the bean bag shotgun until after the incident.  See id. at 80:21-81:4.[14]  As part of the internal investigation of the incident, Benas indicated that the shotgun was fired "momentarily" before the handguns.  See Benas Depo. 51:19-22.  Benas testified that the shots from the shotgun and the shots from the handguns were "very close" and "almost simultaneous."  Id. at 50:21-51:2.  Benas could not distinguish between the shotgun and the handguns because there were multiple shots being fired at the time.  See id. at 52:1-7.  Lightfoot testified that he could not recall whether Craig fired first, whether Hall and Dowling fired first, or whether the shots were fired simultaneously.  See Lightfoot Depo. 22:23-23:2.  Dowling believed that he heard another weapon, other than his and Hall's respective handguns, being discharged during the handgun shots.  See Dowling Depo.

---

[13]There were a total of six gunshot wounds to Prieto's body.  See PAMF 138.  Additionally, the wounds on Prieto's neck were consistent with a screwdriver and were described as "superficial," with the deepest being 3/4" deep.  See PAMF 137; Hartman Depo. 72:4-73:1.

[14]Plaintiff contends that Contreras told an investigator from the district attorney's office that Craig fired the bean bag rounds, and then there was a second volley fired by Hall and Dowling.  See PAMF 112.  This PAMF is supported by a warrant affidavit that was made by an investigator.  See Plaintiffs' Ex. U.  The affidavit states in part: "Mr. Prieto attempted to open the door and make entry at which time less lethal munitions were deployed by [Craig].  Mr. Prieto attempted to get into the door again at which time [Hall] and [Dowling] fired their sidearms striking Mr. Prieto."  Id.  The affidavit does not attribute these specific sentences to Contreras.  The investigator declared that he took notes of what Contreras told him, and the notes were incorporated into the affidavit.  See Plaintiffs' Ex. J.  Contreras denies making such statements.  See Contreras Depo. 80:3-8.  Defendants object to PAMF 112 and the evidence cited in support of it as being "triple hearsay."  The affidavit is problematic.  It is clear that the investigator was not a percipient witness.  Rather, the investigator relies on notes he made about what Contreras purportedly told him, and is incorporating those notes into the affidavit.  See id.  Plaintiffs are using the affidavit to try and establish the order of the shots.  However, there appears to be hearsay, and Plaintiffs have identified no exception.  Further, Contreras has denied that he told the investigator that bean bag shots were fired first and that handgun shots were fired second.  See Contreras Depo. 80:3-8.  To the extent that Plaintiffs are using Exhibit U and what Contreras allegedly told the investigator to establish the order of shots, Defendants' hearsay objection will be sustained.  However, even if the Court were to consider Exhibit U, the relevant section of the affidavit does not state how much time lapsed between the volleys, nor does the affidavit indicate at what point Prieto slumped down, nor does the affidavit discuss the effects of the bean bag rounds.

27:5-11.  Hall was unaware of the bean bag gun.  See Hall Depo. 73:8-12.  Hall did hear two

other discharges of weapons, but he could not tell if the discharges came from two other weapons

or one other weapon.  See id. at 90:22-91:4.  Carrillo did not specifically see anyone firing, and

he could not tell whether the shots that he had heard were from the handguns or the shotgun.  See

Carrillo Depo. 16:6-11.

     Foster Farms employee Marty Weakley testified that he heard two sequences of shots –

one volley was fired, which caused Prieto to turn, and a second volley was fired after Prieto tried

to get through the door a second time.  See Weakley Depo. 27:4-31:4, 35:15-36:1.  Weakley saw

the bean bags land on the ground during the first volley, and assumed that no handguns were

fired because Prieto seemed unaffected by that volley.[15]  See id. at 34:8-21.  Weakley testified

that he did not see bean bags after the second volley, and after the second volley, Prieto slumped

over.  See id. at 35:15-36:1.  Weakley did not recall the lapse in time between the first and

second volley.  See id. at 30:20-25.  Similarly, Linley testified that he perceived two volleys, with

a "brief pause" of no more than ten seconds between the volleys.  See Linley Depo. 20:14-21:18.

Linley could not tell which officers were firing, and that it seemed like they all fired.  See id.

Linley explained that the officers fired both volleys at times when Prieto had either touched or

was reaching for the door.  See id. at 20:3-7, 22:8-18.  Linley did not know whether the shotgun

was fired, but did see handguns fired during the first and second volleys.  See id. at 25:15-26:24.

Linley testified that it was not until the second volley that Prieto went down.  See id. at 21:1-7.

     At the time the shots were fired, Maniss had been in position with his K-9 unit for about 3

to 5 seconds.  See Maniss Depo. 18:17-21, 20:4-10.  Maniss's dog was barking and focused on

Prieto.  See PAMF 88.  However, Maniss did not believe that deployment of the dog was

appropriate due to the close proximity of the other officers.  See Maniss Depo. 15:17-16:1.

     Additionally, at the time of the shots, Prieto was never able to open the double doors and

---

[15]Plaintiffs' PAMF 109 posits that the first volley of shots was all bean bag rounds.  See PAMF 109.
Excerpts from Weakley's deposition is the only evidence cited in support of PAMF 109.  However, as stated above,
Weakley assumed that only bean bag rounds were fired during the first volley because the volley was ineffective, and
Weakley assumed that if live rounds had been fired, Prieto would have gone to the ground.  See Weakley Depo.
27:24-28:7, 34:8-21.  PAMF 109 is based on a lay assumption of how Prieto would likely react to the gunshots.
PAMF 109 has an insufficient basis and, as such, is not established.

1   never had any part of his body inside the double doors.  <u>See</u> PAMF's 96-97.  Prieto never

2   acknowledged or responded to the officers' commands.  PAMF 128.  Prieto never verbally

3   threatened anyone at the scene, and there was no information that Prieto had injured anyone other

4   than himself.  <u>See</u> PAMF's 130-131.  Prieto did not make an aggressive move towards the

5   officers at the time of these shots.  <u>See</u> PAMF 38; Footnote 5 *supra*.  At the time shots were

6   fired, Prieto was holding the screwdriver in his hand, but was not doing anything with it.  <u>See</u>

7   PAMF 94.  Also at the time these shots were fired, Contreras believed that Prieto was a threat to

8   the people in the break room because Prieto "was already homicide [sic], suicidal, and he had

9   already been shot once, and he made no attempt to comply with our demands or surrender."

10   Contreras Depo. 83:25-84:5.  Similarly, Linley testified that he was thankful that the officers

11   fired because he "was very, very fearful that [Prieto] was going to make it inside the break

12   room," and Linley was concerned for the employees who were inside.  Linley Depo. 31:23-32:8.

13

14                  **<u>SUMMARY JUDGMENT FRAMEWORK</u>**

15        Summary judgment is appropriate when it is demonstrated that there exists no genuine

16   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

17   Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v.</u>

18   <u>American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

19   judgment bears the initial burden of informing the court of the basis for its motion and of

20   identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

21   absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986);

22   <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

23   might affect the outcome of the suit under the governing law.  <u>See</u> <u>Anderson v. Liberty Lobby,</u>

24   <u>Inc.</u>, 477 U.S. 242, 248-49 (1986); <u>United States v. Kapp</u>, 564 F.3d 1103, 1114 (9th Cir. 2009).

25   A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to

26   return a verdict for the non-moving party.  <u>Anderson</u>, 477 U.S. at 248; <u>Freecycle Sunnyvale v.</u>

27   <u>Freecycle Network</u>, 626 F.3d 509, 514 (9th Cir. 2010).

28        Where the moving party will have the burden of proof on an issue at trial, the movant

must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

1  'is not significantly probative.'" <u>Anderson</u>, 477 U.S. at 249-50; <u>Hardage v. CBS Broad. Inc.</u>, 427

2  F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

3  circumstances to consider materials that are not properly brought to its attention, but the court is

4  not required to examine the entire file for evidence establishing a genuine issue of material fact

5  where the evidence is not set forth in the opposing papers with adequate references.  <u>See</u>

6  <u>Simmons v. Navajo County</u>, 609 F.3d 1011, 1017 (9th Cir. 2010); <u>Gordon v. Virtumundo, Inc.</u>,

7  573 F.3d 1040, 1058 (9th Cir. 2009); <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885,

8  889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir.

9  2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of

10 material fact, the moving party is entitled to summary judgment.  <u>Nissan Fire</u>, 210 F.3d at 1103.

11

12                          **DEFENDANTS' MOTION**

13 **I.**      **Fourth Amendment – Excessive Force**

14          *Defendants' Argument*

15          Hall and Dowling argue that they used objectively reasonable force.  Prieto had

16 endangered Contreras and other motorists and had lunged at Contreras with a screwdriver.  Prieto

17 defied commands, and instead told officers to shoot him.  Prieto stabbed himself multiple times

18 in the neck, and was under the influence of methamphetamine.  Prieto advanced on Hall and the

19 entry to Foster Farms with a weapon in hand.  Despite being shot one time, Prieto continued

20 going and advanced to a set of doors that lead to a break room and Foster Farms employees.

21 Prieto continued to disobey commands, and attempted to open the doors before being shot.  It

22 was Prieto's decisions, and no one else's, that caused the use of force.  Prieto had every

23 opportunity to stop and avoid the shooting, but he did not stop.  Further, Foster Farms employees

24 were afraid, even when they realized Prieto was a former employee.  While other force options

25 may have been available, the exigency of Prieto attempting to enter the break room where

26 employees were located outweighed trying to use other force options.

27          *Plaintiffs' Opposition*

28          Plaintiffs argue that the facts are profoundly disputed.  The evidence indicates that Prieto

13

did not pose an immediate threat of death or serious injury to Hall during the first shot or to any third parties during the other shots.  A jury could conclude Prieto was simply walking away from the officers injuring himself with the screwdriver, and he never threatened or charged anyone at the time of Hall's first shot.  Likewise, a jury could conclude that the fatal gun shots by Dowling and Hall were fired after Prieto had been incapacitated by several bean bag projectiles and he had slumped to the ground.  Potential threats to occupants of the break room is too speculative and contradicted by the record.

In terms of specific factors and considerations, the force used was the greatest possible, and thus requires the highest justification.  Deadly force is not justified simply because a suspect has a weapon, or because the officers desire to diffuse a situation quickly, or because the officers merely state that they fear for their safety, or because a mentally disturbed individual is acting out or acting suicidal.  Here, there was no need for the gunshots.  Prieto never lunged at anyone, he was not about to stab someone, and he never posed an immediate threat to anyone in the building.  Further, when the final shots were fired, they came from 45 degrees above his mid and upper back, after he had slumped to the ground.[16]  A reasonable jury could conclude that Prieto never threatened anyone with the screwdriver but himself, and thus, it was not necessary to shoot and kill Prieto.  Additionally, the Ninth Circuit has advised that it is appropriate to consider whether a warning was given before deadly force was used.  Here, no warning was given, even though it was practical to do so.  Prieto was not about to open the door and stab anyone, and Dowling had time to tell another officer that he would fire if Prieto went through the doors.  A warning was more important in this case because the officers were in plain clothes and they did not identify themselves as police.  Also, the officers had other force options available.  Maniss was on scene with his K-9 unit, and Craig deployed the bean bag.  In fact, the evidence indicates that the bean bag was gaining Prieto's compliance.

With respect to qualified immunity, the evidence demonstrates a Fourth Amendment

---

[16]According to Dr. Hartman (who performed the autopsy), Prieto had six gun shot wounds.  PAMF 138.  One wound was to the front abdomen with a horizontal trajectory.  See PAMF's 143-145.  One gunshot was at a 45 degree upward angle, and was the only shot that went from right to left.  See PAMF's 140-141.  The four remaining wounds had a downward trajectory, with two having a 45 degree downward trajectory.  See PAMF's 146-149.

violation.  The evidence also shows that it would have been clear to a reasonable officer that it was unconstitutional to shoot to kill a person who was suffering from a mental illness and engaging in self-harming behavior with a screwdriver, but not threatening the officers with a weapon.  This is true of Hall's first gun shot, as well as the subsequent gun shots.

*Legal Standard*

1.      Excessive Force

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly force do not fit into their own separate category with their own set of "rigid pre-conditions" that must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S. at 382-83; Price v. Sery, 513 F.3d 962, 968 (9th Cir. 2008).  The pertinent question in excessive force cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).  The objective inquiry into reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.  Further, where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed.  See Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  "In some cases . . ., the availability of alternative methods of capturing or

1   subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th

2   Cir. 2005).  However, police officers "are not required to use the least intrusive degree of force

3   possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25

4   F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir.

5   2008).  That is, a reasonable use of force "encompasses a range of conduct, and the availability of

6   a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551.

7   It may also be appropriate to consider the parties "'relative culpability,' i.e. which party created

8   the dangerous situation and which party is more innocent, may also be considered." Espinosa v.

9   City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384.

10  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather

11  than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550.

12  "The calculus of reasonableness must embody allowance for the fact that police officers are often

13  forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly

14  evolving – about the amount of force that is necessary in a particular situation." Graham, 490

15  U.S. at 396-97; Wilkinson, 610 F.3d at 550. "Force is excessive when it is greater than is

16  reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

17        2.    Qualified Immunity

18        Qualified immunity protects "government officials . . . from liability for civil damages

19  insofar as their conduct does not violate clearly established statutory or constitutional rights of

20  which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

21  Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

22  Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

23  can be made," and that it is "often difficult for an officer to determine how the relevant legal

24  doctrine will apply to the factual situation that he faces." Estate of Ford v. Ramirez-Palmer, 301

25  F.3d 1043, 1049 (9th Cir. 2002).

26        A court employs a tiered analysis for determining qualified immunity. See Saucier v.

27  Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

28  Cir. 2006); Brittain, 451 F.3d at 987.  However, lower courts need not strictly follow the tiered

1   sequence in analyzing qualified immunity, but instead may dispose of the issue at step two

2   without addressing step one.  Pearson v. Callahan, 129 S.Ct. 808, 821 (2009); Moss v. United

3   States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).  Under the first step, the court

4   determines whether, "taken in the light most favorable to the party asserting the injury, do the

5   facts show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201;

6   Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229.  The first step is a question of fact.  Dunn v.

7   Castro, 621 F.3d 1196, 1199 (9th Cir. 2010); Tortu v. Las Vegas Metro. Police Dep't, 556 F.3d

8   1075, 1085 (9th Cir. 2009).  If the answer is "no," then the inquiry ends and the plaintiff cannot

9   prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201;

10  Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007).

11          Under the second step, the court determines "whether the right was clearly established,"

12  and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th

13  Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The second step is a question

14  of law.  See Dunn, 621 F.3d at 1199; Tortu, 556 F.3d at 1085.  The critical question is whether

15  "the contours of the right were sufficiently clear that a reasonable official would understand that

16  what he is doing violates the right."  Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079.

17  Whether a right is clearly established must be "undertaken in light of the specific context of the

18  case, not as a broad general proposition."  Saucier, 533 U.S. at 201; Skoog, 469 F.3d at 1229-30.

19  In making this determination, the court considers the state of the law at the time of the alleged

20  violation, but it is unnecessary for the precise conduct in question to have been previously held

21  unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir.

22  2000).  Further, the court considers the "information possessed" by the officer at the time of his

23  conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635,

24  641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th Cir. 2007).  If

25  the officer could have reasonably, but mistakenly, believed that his conduct did not violate a

26  clearly established constitutional right, then the officer will receive qualified immunity.  See

27  Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Jackson v. City of Bremerton, 268 F.3d

28  646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see Brittain, 451 F.3d at 988, the

17

"'subjective beliefs' of the actual officer are . . .irrelevant." Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a reasonable officer could have believed [the action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed.'" Lawrence v. United States, 340 F.3d 952, 956-57 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.  Whether the law was "clearly established" and whether an officer could have a reasonable, albeit mistaken, belief that his conduct was lawful are questions of law for the court to decide on summary judgment when the pertinent material facts are undisputed.  See Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002); LaLonde v. County of Riverside, 204 F.3d 947, 953-954 (9th Cir. 2000); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).

*Discussion*

1.      Fourth Amendment Violation

a.      Hall's First Shot

As indicated above, the Court must examine not only certain enumerated considerations, but also any other pertinent consideration that is part of the totality of the circumstances.

First, the use of force identified by Plaintiffs is the first gun shot fired by Hall prior to Prieto entering the courtyard.  There is no dispute that this quantum of force is very significant. It is in fact deadly force, although this shot did not kill Prieto.

Second, at the time Hall fired the shot, there was at least one felony involved.  Based on Prieto coming at Contreras with the screwdriver, California Penal Code § 245(d), assault with a deadly weapon on a peace officer, was clearly involved.[17]  This is a significant and serious felony that is inherently violent, and Hall was aware of the conduct.  See DUMF 7; Hall Depo. 31:19-23.  Additionally, it would appear that the misdemeanors of willful resistence or obstruction under Penal Code § 148(a)(1), and reckless driving under Vehicle Code § 23103, would be at issue.  Generally, misdemeanor offenses do not justify significant uses of force.  See Bryan v. McPherson, 630 F.3d 805, 828-29  (9th Cir. 2010).  As a general proposition, reckless driving and obstruction are not inherently violent.  However, there are myriad ways of committing these

---

[17]Although Contreras may have been in plain clothes, his car had lights and a siren and he utilized the light and siren when he turned his car around and pursued Prieto.  See Contreras Depo. 16:7-16, 21:5-15.

offenses.  In this case, reckless driving was committed when Prieto was traveling the wrong

direction and towards on-coming traffic going around 80 m.p.h.  The risk of serious injury due to

a high speed head-on collision from such conduct was high, and was a possibility faced directly

by Contreras.  Hall was aware that Prieto had driven at Contreras "head on."  See Hall Depo.

15:6-10.  As committed by Prieto, this was a significant offense.  Further, Prieto refused to

follow the officers' lawful commands to "stop" and to "drop" his weapon/screwdriver.  Despite

this, Prieto kept walking and never dropped the screwdriver.  This offense is more significant

than a typical obstruction case because the officers were attempting to disarm Prieto of the

weapon that he had used to come at Contreras.  Accordingly, Prieto's reckless driving and

obstruction provide a greater governmental interest then typical misdemeanors.

Third, in terms of the threat posed by Prieto, Hall testified that Prieto was not running at

him when he fired the shot, and Prieto was 8 to 10 feet away from Hall.  See Hall Depo. 45:16-

55:17; DUMF 13.  However, Hall was aware that Prieto had charged at Contreras with the

screwdriver.  See DUMF 7; Contreras Depo. 42:25-43:4; Hall Depo. 31:19-23.  Further, Hall

testified that Prieto's body had twisted and it looked like he was about to charge Hall.  See Hall

Depo. 49:4-14, 55:10-17.  When Hall fired the shot, he did so because Prieto had advanced on

Hall with the screwdriver raised.  See id.; Benas Depo. 32:25-34:12.  Lightfoot confirmed that

Prieto had turned towards Hall.  See Lightfoot Depo. 15:7-16:10.  Prieto had stabbed himself in

the neck with the screwdriver.  See Hall Depo. 49:4-14; Benas Depo. 32:25-34:12.  Both Hall

and Lightfoot believed that Prieto posed a threat to Hall when Hall fired the shot.  See  Hall

Depo.49:4-14, 54:5-12; Lightfoot Depo. 16:3-10.  Hall was positioned in front of an entrance that

led into the Foster Farms facility.  See Hall Depo. 36:19-37:7.  Hall believed that if Prieto got

through him and entered through the doors, Prieto would be a threat to those inside.  See id.

Fourth, Prieto was either resisting or actively evading the officers.  The officers were

giving continuous commands to Prieto to stop and to drop his weapon, yet Prieto never did so

and kept moving.  See Hall Depo. 52:4-9.  Prieto had refused to obey commands to stop from the

time that he exited his vehicle, to the time he ran to the Foster Farms facility, to the time of

Hall's shot.  See id.

19

Fifth, it does not appear that Hall warned Prieto that he would shoot if Prieto did not stop. It is not clear how practical a warning would have been.  Nevertheless, it is significant that Prieto had ignored the constant warnings up until this point, and that Prieto had told the officers that they would have to shoot him.  See Hall Depo. 32:7-33:3, 52:4-9.

Sixth, Prieto appeared to be either "crazy" or under the influence of drugs.  In fact, he was under the influence of drugs.  As just noted, Prieto told the officers that they would have to shoot him, and after Prieto said that, he began stabbing himself in the neck with the screwdriver.  See Hall Depo. 32:7-33:3, 52:4-9.  Prieto clearly was not in a normal frame of mind.

Seventh, it is unknown what alternative, less lethal means were available to Hall at this time.  While Hall radioed for a Taser weapon, there is no indication that a Taser was ever present.  Further, while it is possible that Hall could have moved out of Prieto's way, Hall was behind an entrance that would have provided a means for Prieto to enter the Foster Farms plant.

Eighth, Prieto bears considerable responsibility for this shot being fired.  At any point up to the shooting, if Prieto had simply not advanced on Hall, or more importantly if he would have only obeyed any of the numerous commands and actually stopped and dropped the screwdriver, the shot would not have been fired.

Under the totality of the circumstances, Hall did not violate the Fourth Amendment.  As mentioned above, a serious and violent felony offense was at issue, as well as significant misdemeanors.  Prieto was not responding to any requests to stop and to drop his weapon.  Prieto had already used the screwdriver in an attempt to stab Contreras, and Prieto had actually stabbed himself in the neck with the screwdriver.  Prieto's conduct was dangerous, and although it appeared that Prieto was mentally impaired, that impairment (which was due to methamphetamine) added to the danger of the situation in that Prieto was refusing to obey commands, and had acted in a violent and destructive manner in response to commands.  While Plaintiffs contend that Prieto made no aggressive movements towards Hall, the evidence does not support the assertion.  As discussed above, Linley neither saw nor heard the shot fired by Hall, and had momentarily turned away from the scene.  As such it is not reasonable to assume that Linley observed the incident with Prieto at this relevant stage.  On the other hand, both Hall and

Lightfoot saw Prieto's conduct, Prieto still had the screwdriver, and Prieto was coming towards Hall with the screwdriver raised.  Both of these officers believed that Prieto posed a threat to Hall.  Given Prieto's behavior, the evidence supports this conclusion.  It is true that Prieto was 8 to 10 feet away from Hall.  However, Hall's back was to an entrance of the plant, and a distance of 8 to 10 feet can be traversed quickly.  There is no dispute that there were people in the Foster Farms plant at this time, nor is there any evidence to suggest that Hall's concern about Prieto entering the plant was fanciful or unreasonable.  This incident occurred during working hours, and Prieto's behavior clearly supports a reasonable and legitimate concern for the safety of those in the plant.  Cf. Elliot v. Leavit, 99 F.3d 64, 644 (4th Cir. 1996) ("[T]he Fourth Amendment does not require omniscience.  Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others.  Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm . . . ."); cf. also Wilkinson, 610 F.3d at 553 (quoting Elliot with approval).  Additionally, there is no indication what less lethal options may have been available, nor is there any indication that less lethal means were a viable option.  Also, given Prieto's appearance, his refusal to follow any commands, his statement that the officers were going to have to shoot him, and his self destructive behavior, there is no indication that Hall's failure to warn Prieto before firing the single gun shot is significant.  There is nothing to indicate that Prieto would have heeded this command and actually stopped.  Finally, if Prieto had only obeyed and stopped, the shot would not have been fired.

Under the totality of these circumstances, Hall did not violate the Fourth Amendment when he fired this gun shot.  See Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 551-53; Elliot, 99 F.3d at 644.

b.    Fatal Shots

Again, just as it did above, the Court must examine various enumerated considerations as well as any other pertinent consideration that is part of the totality of the circumstances.

First, the additional uses of force identified by Plaintiffs are the gunshots fired by Hall and Dowling.  Firing a handgun is a significant quantum of force that constitutes deadly forces.

1    A significant justification is necessary for the firing of a firearm.

2          Second, the crimes involved remained the same from the time of the first shot.  The facts

3    indicated that the serious and violent felony of assaulting a police officer with a deadly weapon

4    (Penal Code § 245(d)), as well as the misdemeanors of willful resistence or obstruction (Penal

5    Code § 148(a)(1)) and reckless driving (Vehicle Code § 23103), were at issue.  As discussed

6    above, the manner in which Prieto committed these misdemeanor offenses increases their

7    severity and the government's interest in stopping Prieto.

8          Third, in terms of the threat posed by Prieto, Prieto did not make any aggressive moves

9    towards the officers at this time, the officers had formed a semi-circle around Prieto, Prieto did

10   not say anything to the officers, and Prieto did not brandish the screwdriver at the officers.  As

11   such, Prieto did not pose an imminent threat to the officers at the time of the fatal shots.  In terms

12   of the threat to those in the plant, there were individuals in the break room and Prieto was in front

13   of the break room doors.  Ramos and Linley testified that the doors would not have been locked.

14   Hall, Contreras, and Benas saw employees (though no one specific) in the break room area, and

15   further investigation confirmed that employees were present at that time.  See Benas Depo. 42:4-

16   44:8; Carrillo Depo. 18:18-22; Contreras Depo. 65:5-66:25; Hall Depo. 77:1-17.  Prieto was still

17   armed with the screwdriver.  PAMF 94.  Importantly, Prieto was attempting to gain access into

18   the plant/break room.  Plaintiffs acknowledge that witnesses vary regarding whether Prieto had

19   actually touched the handle.  Of the evidence cited to the Court, the only witness who testified

20   that Prieto did not actually touch the handle was Ramos, but even she testified that Prieto was at

21   least reaching for the door handle.[18]  See Ramos Depo. 22:8-15.  Further, of the two witnesses

22   who believed that two volleys were fired, both testified that it was the second volley that brought

23   Prieto down, and each volley was fired in response to Prieto attempting to get through the doors.

24   See Linley Depo. 20:3-22:18; Weakley Depo. 27:4-31:4, 35:15-36:1.  Because of Prieto's prior

25   behavior, Hall feared that Prieto would pose a serious risk to those inside the plant.  See Hall

26   Depo. 80:4-8.  Contreras believed that, based on Prieto's behavior, that Prieto was a threat to

27

28          [18]Plaintiffs do not to take a concrete position regarding whether Prieto actually touched the door handle,
     and are content to point out that Prieto was not able to open the doors.  See Court's Docket Doc. No. 40 at 4:13-18.

people in the plant.  See Contreras Depo. 83:25-84:5.  After seeing Prieto face to face at the guard shack, Linley was afraid of what Prieto would do to the employees in the break room if Prieto managed to get inside.  See Linley Depo. 31:23-32:8.

Fourth, Prieto was either resisting or actively evading the officers.  Prieto never obeyed the constant commands of the officers to "stop."  Prieto kept moving, and was attempting to enter the double doors into the plant/break room area when the shots were fired.  See Craig Depo. 28:5-17; Hall Depo. 79:24-80:18.

Fifth, with respect to warnings, the officers testified that they warned Prieto to stop, to drop the screwdriver, and to not go inside the plant.  See Hall Depo. 80:3-4; Contreras Depo. 91:10-18; Maniss Depo. 17:12-18.  Further, Linley testified that he heard an officer warn Prieto to "not go in there" or that the officers would shoot.  See DUMF 16.  Plaintiffs contend that none of the officers warned Prieto that shots would be fired.  See PAMF 123.  However, the broad proposition that "none of the officers warned" is not supported by the cited evidence.  It is true that the testimonies of Hall, Dowling, and Contreras indicate that those officers did not warn Prieto that shots would be fired, and Carrillo testified that he simply did not hear such a warning. However, Plaintiffs do not account for officers Lightfoot, Benas, Craig, or Maniss.  These officers were at the scene, yet there is no evidence cited regarding what commands they may have issued to Prieto.  That one officer may not have heard the warning, and other officers themselves did not give the warning, does not mean that the warning was not given by another officer.  Hall, Contreras, Carrillo, and Dowling's respective testimonies do not contradict Linley.

Sixth, as Prieto walked passed the guard shack, he looked extremely angry and "out of his mind," and Linley felt "real fear" for anyone who came into contact with Prieto.  See Linley Depo. 18:6-22.  Ramos testified that, although Prieto did not have his normal look of anger, Prieto looked unstable and she was afraid of him.  See Ramos Depo. 33:3-34:20.  Other officers described Prieto as "out of it" or "in a daze" or like he was on drugs.  Further, Prieto had continued to stab himself with the screwdriver after he was shot by Hall with the prior single shot.  See PAMF 41.  It is clear that Prieto's state of mind remained abnormal.

Seventh, there were less lethal options on-scene.  Although the Taser weapon apparently

never arrived, Craig was present with his bean bag shotgun, and Maniss was present with a K-9 unit.  However, Maniss testified that using the K-9 unit was not a viable option because of the close proximity of the other officers.  See Maniss Depo. 15:17-16:1.  There is no evidence to contradict this assessment.  As such, the Court can only conclude that use of the K-9 was not a viable option.

Eighth, Prieto again bears significant responsibility for this shooting.  The evidence is uncontradicted that no shots of any kind were fired until Prieto attempted to enter the plant (either by reaching for the doors according to Ramos, or by actually touching the doors according to every other witness).  Prieto was warned numerous times to stop, to drop the weapon, and to not enter the plant.  Again, if Prieto had obeyed any of those commands, especially the numerous commands to stop, no shots would have been fired.

Additionally, in connection with Plaintiffs' concerns regarding a warning, Plaintiffs point out that Contreras, Dowling, and Hall were in "plain clothes."  See PAMF's 26-28.  However, Contreras utilized the lights and siren of his car when he pursued Prieto's vehicle, and Prieto later came at Contreras with the screwdriver.  See Contreras Depo. 21:5-15, 24:6-26:14.  Further, prior to the single shot fired by Hall, Hall yelled that he was the police.  See Hall Depo. 33:17-34:3, 36:8-11.  Also, it does not appear that Craig was in plain clothes.  Finally, Linley testified that it was "pretty apparent" that the officers involved were the police, and there was no doubt in his mind of that fact.  See Linley Depo. 12:17-13:1.

Under the totality of the circumstances, there is no Fourth Amendment violation.  As explained above, a serious and violent felony, as well as significant misdemeanors, were involved.  As he had done previously, Prieto refused to obey or comply with any of the commands that the officers gave.  This includes a warning that Prieto would be shot if he entered the double doors.[19]  This shows a very high level of culpability.  If at any time prior to the shots

---

[19] As discussed above, Plaintiffs do not adequately dispute the assertion that some officer yelled for Prieto to not go through the doors, or else they would shoot.  However, even if the Court were to find that there is a genuine dispute on the issue of a warning, the result would not change.  Prieto was attempting to go through the doors and enter the plant.  Given Prieto's prior conduct, the officers could not let that happen.  The officers had been giving Prieto warnings and commands since Prieto exited his car.  Prieto never obeyed.  In fact, his only response was defiance, either through ignoring the officers or stating that the police would have to kill him and then stabbing

being fired at the double doors Prieto had simply stopped and dropped the screwdriver, he would

not have been shot.  Further, while Plaintiffs focus on Prieto's non-aggressive conduct towards

the officers at that point, they overlook entirely Prieto's prior aggressive conduct and the

presence of employees in the break room.  There is no evidence that the break room door was

locked, and the evidence is actually to the contrary.  Further, there is no genuine dispute that

employees were actually in the break room.  Three of the officers, including Hall, saw people in

the break room, and it was later determined that employees were there.  Hall was worried about

the safety of the employees.  Not only was Hall's concern shared by other officers, it also was

shared by Foster Farms employees.  Linley vividly expressed his fears for those in the break

room, Ramos was afraid of Prieto even though she was familiar with him, and Weakley was

holding the door shut to keep Prieto out in order to protect the women inside.  Moreover, as

discussed previously, Prieto had come at or attempted to stab Contreras with the screwdriver, and

had driven his vehicle head on towards Contreras.  Prieto had also stabbed himself in the neck

with the screwdriver and informed officers that they would have to kill him.  Prieto had also been

shot one other time by Hall, yet still kept going.  These are objective facts that demonstrate the

clear danger posed by Prieto.  Hall's fear for the employees inside was entirely reasonable and

justified.  Plaintiffs' attempt to characterize Prieto as simply in a daze, possibly suffering from a

mental illness, and not a threat to anyone is belied by the entirety of the record.[20]  Cf. Wilkinson,

610 F.3d at 551, 553 ("sanitized version of the incident cannot control summary judgment when

the record as a whole does not support that version").  At the time any shots were fired, be they

from the shotgun or from the handguns, Prieto was attempting to enter the break room doors

where he would have encountered employees.  His behavior was erratic, unpredictable, and

dangerous.  It was clearly appropriate for the officers to attempt to prevent Prieto from entering

the plant.  Further, time was of the essence because Prieto was attempting to enter through the

himself in the neck.  There is no reason to think that a warning at this point (while Prieto was attempting to enter)
would have altered the course of events or had any effect whatsoever.

[20]The Court notes that there is no evidence that Prieto actually suffered from a mental illness, rather, the
evidence confirms the officers' (including Hall) suspicions that Prieto was under the influence of drugs.

double doors.  Although the officers may not have known for certain how many people were inside, and may not have known for certain whether the door was locked, absolute certainty is not required.  Cf. Wilkinson, 610 F.3d at 553; Elliot, 99 F.3d at 644.  Several officers, including Craig, believed that Prieto had begun to jiggle the handle, and at a minimum he was reaching for the doors.  Indeed, according to Linley and Weakley, Prieto actually made two attempts to open the door, and both attempts prompted the officers to fire.  See Linley Depo. 21:1-7, 25:15-26:24; Weakley Depo. 34:8-36:1.  Given the presence of employees in the break room, and the obvious danger posed to the employees by Prieto, the officers were not required to wait and see whether Prieto could successfully open the doors.

In terms of less lethal options, Craig deployed his bean bag shotgun against Prieto.  Plaintiffs contend that the bean bag actually caused Prieto to slump over and to "give up," thereby making the additional use of the handguns unnecessary and unreasonable.[21]  Plaintiffs rely on the deposition testimony of Craig for this argument.  Officer Craig testified that he believed his bean bag rounds caused Prieto to turn around, to grimace, and after the fourth shot had been fired, to go down/slump over.  See Craig Depo. 39:10-40:21.  However, Craig was not aware of any other shots being fired, and there is no testimony from Craig which would indicate whether he ever knew that handguns had been fired.  See Craig Depo. 33:12-22, 43:12-15.  In fact, when asked what he did after Prieto had gone down (which was after Craig had fired the fourth bean bag round), Craig stated that he kept his shotgun sighted on Prieto, and then Dowling ordered Prieto to lay on his stomach, but Prieto was unresponsive.  See Craig Depo. 41:25-42:11, 47:5-23.  Craig testified that Dowling kicked the screwdriver out of Prieto's hands, and then checked Prieto's vitals.  See id. at 47:5-23.  There is no testimony about waiting until the other officers finished firing, or that the other officers actually fired.  As for the other officers, Contreras believed that Prieto began to drop sometime during the gunshots, but has no understanding of whether the handguns or the shotgun was fired first.  See Contreras Depo. 85:1-4, 103:13-23; PAMF 116.  Benas believed that the handguns and the shotgun were fired very

---

[21]However, at other points, Plaintiffs posit that Prieto began to drop during the gunshots.  See PAMF 116.

close in time and almost simultaneously, but possibly the shotgun was momentarily being fired

first.  See Benas Depo. 50:21-51:22.  Carrillo could not differentiate between the shotgun and the

handgun shots.  See Carrillo Depo. 16:6-11.  Lightfoot could not recall what weapons were fired

first.  See Lightfoot Depo. 22:23-23:2.  Dowling was aware that another weapon other than

Hall's handgun was being fired.  See Dowling Depo. 27:5-11.  Hall was unaware of the shotgun,

but was aware of two other discharges.  See Hall Depo. 73:8-12, 90:22-91:4.  With respect to the

third party non-police officer witnesses, Weakley and Linley testified that Prieto slumped down

during the handguns being fired, but Linley did not know if the shotgun was fired at all, and

Weakley assumed the shotgun was fired first simply because the first volley did not affect Prieto.

See Linley Depo. 21:1-7, 25:15-26:24; Weakley Depo. 34:8-36:1.  In light of the testimony, the

record as a whole does not support Craig's belief that his fourth shotgun round caused Prieto to

drop/slump over and give up.  Cf. Wilkinson, 610 F.3d at 551, 553.  The record as a whole

indicates that, at best, Prieto slumped over as both the shotgun and handgun shots were being

fired.  At worst, the record indicates (through Linley and Weakley and Contreras) that Prieto

slumped during the gun shots, and that the shotgun was ineffective (other than causing Prieto to

briefly turn towards the officers) because Prieto again attempted to open the doors.  The record

does not support the conclusion that the bean bag shotgun was effective in stopping Prieto.[22]

Finally, Plaintiffs argue in part that the downward angle of some of the bullet wounds

indicate that Prieto was down, and therefore no longer a danger.  The evidence is unclear at

exactly what point in time Prieto dropped.  Craig believed that Prieto went down just after the

fourth bean bag round, and Contreras testified that Prieto went down sometime during the gun

shots.  See Craig Depo. 42:4-11; Contreras Depo. 103:18-23; PAMF 116.  Craig and Hall both

testified that they fired in quick or rapid succession.  See PAMF 98; Hall Depo. 92:7-9.  Dowling

testified that he fired because he did not believe that Hall's shots were effective, and only fired

---

[22]Nor would the facts of this case require the officers to first try the bean bag shotgun before using the handguns.  There is no dispute that Prieto was trying to enter the break room area.  As discussed above, given Prieto's dangerous behavior, the officers had to act quickly to prevent Prieto from entering.  The danger posed by Prieto to those in the plant was very real, and was recognized not only by the police, but by actual Foster Farms employees as well.  The use of deadly force was reasonable, irrespective of the availability of the bean bag shotgun.  See Wilkinson, 610 F.3d at 551; Gregory, 523 F.3d at 1107; Forrester, 25 F.3d at 807.

1  one time because as he fired, Prieto was dropping. See Dowling Depo. 23:9-23, 25:10-16.

2  Dowling and Craig also testified that the fatal shooting happened very quickly.  See Dowling

3  Depo. 34:23-24; Craig Depo. 42:4-11; see also Contreras Depo. 103:5-9 (when asked whether

4  shooting was justified, answering "you're talking a matter of split seconds . . . it was dependent

5  on [Prieto] entering that break room . . . .").  Additionally, Craig testified that when Prieto

6  dropped, he did not drop quickly, but instead Prieto just started to slump down.  See Craig Depo.

7  42:4-11.  Contreras indicated that he saw Prieto drop "almost instantly" once Contreras noticed

8  blood from the shots on Prieto.  See Contreras Depo. 92:16-19.  Under the facts identified, this

9  was clearly a quickly evolving situation.  It appears that multiple shots were fired because the

10  first shot(s) were not effective, and it appears that all shots were fired in rapid succession in order

11  to stop Prieto from entering the plant/break room.  That is, the shots were fired to end the threat

12  posed by Prieto and his attempt(s) to enter the plant/break room area.  The evidence does not

13  suggest mindless shooting.  In this quickly evolving situation, that some of the shots may have hit

14  Prieto as he was slumping or had dropped is not sufficient to show excessive force.  Cf.

15  Wilkinson, 610 F.3d at 552-53 (rejecting under the facts of the case a rule that officers are

16  required to reevaluate after each shot whether a threat has been eliminated); Elliot, 99 F.3d at 643

17  (concluding that firing multiple shots "does not suggest the officers shot mindlessly as much as it

18  indicates that they sought to ensure the elimination of a deadly threat.").[23]

19       Under the totality of these circumstances, Hall and Dowling did not violate the Fourth

20  Amendment when they fired these shots.  See Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d

21  at 551-53; Elliot, 99 F.3d at 643-44.

22       2.    Qualified Immunity

23       Alternatively, the Court believes that qualified immunity is appropriate.  Plaintiffs

24  contend that qualified immunity is improper because it would be clear to a reasonable officer that

25  it is unconstitutional to shoot to kill a person who is suffering from a mental illness and engaging

26  in self-harming behavior with a screwdriver, but not threatening the officers.  However,

27

28       [23]Wilkinson relied on Elliot and utilized the quoted material from Elliot as part of a parenthetical citation.
    See Wilkinson, 610 F.3d at 552-53.

1  Plaintiffs' characterization of what occurred in this case is unsupported and unreasonable.  Cf.

2  Wilkinson, 610 F.3d at 551, 553.

3        Prieto's conduct was not simply self-destructive.  He had driven the wrong direction

4  towards on coming traffic at a high speed, and he had charged or come at Contreras with the

5  screwdriver.  That is, Prieto had attempted to stab Contreras.  Prieto never obeyed any command,

6  including commands to stop, but instead kept going, told the officers that they would have to kill

7  him, and then stabbed himself in the neck.  When Hall fired the first shot, it is not genuinely

8  disputed that Prieto was advancing on Hall.  Hall was concerned for his safety and the safety of

9  those in the plant because Hall was standing in front of an entrance.  Lightfoot confirmed the

10  threat posed to Hall.  Further, after Hall fired the shot and Prieto made his way to the courtyard

11  and the double doors, Linley, Ramos, and Weakley were all afraid of Prieto and what Prieto

12  might do to those in the plant.  Prieto ignored commands, including a command to not enter the

13  double doors, and attempted to enter the plant/break room area.  There is no genuine dispute that

14  there were people behind the double doors in the break room, and Hall knew this.  From the

15  moment Prieto exited his vehicle to the moment that the last shot was fired, Prieto was armed

16  with the screwdriver.  Prieto's behavior was erratic, unstable, unpredictable, and dangerous.

17  Both the police and the civilian witnesses were fearful and recognized the clear and present

18  danger that Prieto posed to the employees in the plant/break room area.

19        In light of these facts, it would not be clear to a reasonable officer in Dowling's position

20  and in Hall's position (at both times when Hall fired) that the shots fired would violate the Fourth

21  Amendment.  Saucier, 533 U.S. at 201-06; Skoog, 469 F.3d at 1229-30; Lawrence, 340 F.3d at

22  956-57.  As such, qualified immunity for Dowling and Hall is appropriate.  See id.

23

24  **II.**    **Fourteenth Amendment**

25        Defendants have not expressly moved for summary judgment on the Fourteenth

26  Amendment claim.  Nevertheless, Plaintiffs' Fourteenth Amendment claim is predicated on

27  Prieto's death through the allegedly "unjustified shooting" by Hall and Dowling.  See SAC ¶¶ 31,

28  34-35.  In light of the finding that Hall and Dowling did not violate the Fourth Amendment when

they shot Prieto, there is no Fourteenth Amendment violation.  Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship.  See Gausvik v. Perez, 392 F.3d 1006, 1008 (9th Cir. 2004); Schaefer v. Goch, 153 F.3d 793, 799 (7th Cir. 1998) ("Because we have concluded that Sergeant Goch did not violate Kathy Nislowski's rights under the Constitution, her parents' claims based on the loss of her society and companionship necessarily fail as well.").  Further, while the standards for reviewing claims under the Fourth Amendment and the Fourteenth Amendment are not identical, a finding that conduct was objectively reasonable leads to the conclusion that the same conduct does not offend the more stringent standard applicable to substantive due process claims.  Brittain v. Hansen, 451 F.3d 982, 997 (9th Cir. 2006); Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 & n.4 (9th Cir. 1998). The evidence does not indicate that Hall and/or Dowling acted with a purpose to harm that was unrelated to the legitimate law enforcement objective of neutralizing the threat that Prieto posed to those in the plant/break room area.  See Wilkinson, 610 F.3d at 554.  Plaintiffs cannot recover under this claim.  Summary judgment is therefore appropriate.  See id.; Brittain, 451 F.3d at 997; Gausvik, 392 F.3d at 1008; Moreland, 153 F.3d at 799; Schaefer, 153 F.3d at 799.

**III.**   *Monell* **Liability**

Plaintiffs state that they do not oppose summary judgment/dismissal of their *Monell* claims.  See Opposition at 1:19.  In light of Plaintiffs' express non-opposition, the Court will grant summary judgment on this claim.[24]

**IV.**   **State Law Battery & Negligence**

*Defendants' Argument*

Defendants argue that the battery and negligence claims are the mirror image of the

---

[24]Also, since the Court has found that the officers did not violate the Constitution, *Monell* liability is not possible.  Los Angeles v. Heller, 475 U.S. 796 (1986); Simmons, 609 F.3d at 1021; Jackson, 268 F.3d at 653-54.

1  excessive force claim.  California courts analyze battery claims against police officers under the

2  same reasonableness standards of the Fourth Amendment.  For the same reasons that summary

3  judgment was appropriate with regard to excessive force, so too is it appropriate with respect to

4  the state law claims.  Additionally, in reply, Defendants point out that California appellate courts

5  have rejected negligence claims against the police based on the officers' tactical decisions.

6          *Plaintiffs' Opposition*

7          Plaintiffs argue that summary judgment as to the battery claim is inappropriate for the

8  same reasons that summary judgment on the excessive force claim is inappropriate.  Also, with

9  respect to negligence, Plaintiffs argue that the Ninth Circuit has reaffirmed the viability of state

10  law negligence claims against police officers based on pre-shooting tactics.  Although the Ninth

11  Circuit did not expressly state the duty, it is the ordinary duty of care.  Here, the negligent

12  conduct that precipitated the use of deadly force "includes but is not limited to" – (1) not verbally

13  identifying themselves as police officers while in plain clothes and pointing guns at Prieto, (2)

14  cornering Prieto into locations where deadly force was used allegedly because of the path that

15  Prieto took, (3) not warning Prieto that he would be shot if he did not comply, (4) not waiting for

16  less lethal force to arrive and/or be effective, (5) and not properly communicating regarding the

17  availability of less lethal options.

18          *Discussion*

19          1.     Battery

20          Battery is a state law tort counterpart to a 42 U.S.C. §1983 excessive force claim.  See

21  Sanders, 551 F.Supp.2d at 1179; Munoz v. City of Union City, 120 Cal.App.4th 1077, 1102 n.6

22  (2004); Susag v. City of Lake Forest, 94 Cal.App.4th 1401, 1412-13(2002); Edson v. City of

23  Anaheim, 63 Cal.App.4th 1269, 1274 (1998).  Because the Court has found no Fourth

24  Amendment violation, summary judgment in favor of Defendants on Plaintiffs' state counterpart

25  cause of action for battery is appropriate.[25]  See Johnson v. County of Los Angeles, 340 F.3d 787,

26  ─────────────────────

27          [25]The City is also a named defendant under this cause of action through application of the vicarious liability
provision of California Government Code § 815.2.  However, an employer cannot be held vicariously liable unless

28  the employee is found responsible/liable, and a finding that exonerates the employee also exonerates the employer.
See Lathrop v. Healthcare Partners Medical Group, 114 Cal.App.4th 1412, 1423 (2004); Perez v. City of Huntington

794 (9th Cir. 2003); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2002); Saman v. Robbins, 173 F.3d 1150, 1156 n.6 (9th Cir. 1999); Sanders, 551 F.Supp.2d at 1179.

      2.    Negligence

As an initial matter, Plaintiffs' citation to *Hayes v. County of San Diego*, 638 F.3d 688 (9th Cir. 2011), is no longer proper. After this motion was taken under submission, the Ninth Circuit withdrew its *Hayes* opinion, certified a question to the California Supreme Court regarding the viability of negligence claims against police officers, stayed the case, and maintained jurisdiction over the appeal. See Hayes v. County of San Diego, - - - F.3d - - -, 2011 U.S. App. LEXIS 11987 (9th Cir. June 14, 2011). Accordingly, the first *Hayes* opinion does not control resolution of this cause of action.

Two California appellate courts have held that the type of pre-shooting negligence claim alleged by Plaintiffs is precluded because no duty is owed by the police. See Munoz v. City of Union City, 120 Cal.App.4th 1077 (2004); Adams v. Fremont, 68 Cal.App.4th 243 (1999). However, the Ninth Circuit's subsequent *Hayes* certification opinion casts some doubt as to whether the California Supreme Court would agree with *Munoz* and *Adams*. See Hayes, - - - F.3d - - - , 2011 U.S. App. LEXIS 11987. In light of the *Hayes* certification opinion, the Court will assume without deciding that Hall and Dowling owed Prieto a duty to use due care with respect to their pre-shooting tactics.

The elements of actionable negligence are: (1) a legal duty to use due care; (2) a breach of that duty; (3) causation; and (4) damages. See Ladd v. County of San Mateo, 12 Cal.4th 913, 917 (1996); Brown v. Ransweiler, 171 Cal.App.4th 516, 534 (2009). Ordinarily, the issues of breach and causation are questions of fact for the jury. See Lindstrom v. Hertz Corp., 81 Cal.App.4th 644, 652 (2004). However, in an appropriate case in which there is insufficient evidence, a defendant's lack of negligence may be determined on summary judgment. See Brown, 171 Cal.App.4th at 535-38; Lindstrom, 81 Cal.App.4th at 652. Plaintiffs have identified

---

Park, 7 Cal.App.4th 817, 819-20 (1992); Davison v. Diamond Match Co., 10 Cal.App.2d 218, 221-224 (1935). Because Hall and Dowling did not commit battery, the City cannot be vicariously liable for battery. See id.

five acts that they claim show actionable negligence.

First, Plaintiffs contend that Hall and Dowling were negligent in not verbally identifying themselves as police officers.  However, as noted above, prior to the very first shot, Hall yelled "police" twice while he was ordering Prieto to stop.  Further, Contreras had utilized the lights and siren on his car as he followed and confronted Prieto.  Finally, Linley stated that it was "pretty apparent" that the individuals following Prieto were police officers, and he had no doubts as to this fact.  The evidence does not support actionable negligence under this theory.

Second, Plaintiffs contend that Hall and Dowling cornered Prieto into places where deadly force would have to be used.  However, there is insufficient evidence that Hall and Dowling cornered Prieto into improper locations, or that Hall and Dowling's movements were negligent or a breach of proper police protocol.  Moreover, the location itself did not require the use of deadly force.  Instead, Prieto's continuous refusal to follow lawful and proper commands to stop, as well as his attempted entrance into the plant/break room area, is what necessitated the use of deadly force.  The evidence does not support actionable negligence under this theory.

Third, Plaintiffs contend that Hall and Dowling were negligent in failing to warn Prieto that he would be shot if he did not comply.  However, as explained above, while neither Hall nor Dowling so warned Prieto, some officer did warn Prieto not to go into the plant or else the officers would shoot.  Thus, Prieto was warned.  Alternatively, and also as explained above, at no point in the entire encounter with Prieto, beginning from the exit from his automobile, did Prieto comply with any command given by any officer.  Instead, Prieto came at Contreras with the screwdriver, kept moving, said the officers would have to shoot him, and then stabbed himself in the neck.  There is absolutely no indication that any additional warning that Prieto would be shot if he did not comply would have made any difference whatsoever.  The evidence does not support actionable negligence under this theory.

Fourth, Plaintiffs contend that Hall and Dowling were negligent for failing to wait for less lethal force options to either arrive or be effective.  However, the evidence establishes that Prieto was attempting to enter the plant/break room area at the time shots were fired.  As discussed extensively above, Prieto's behavior showed that he represented a real and imminent threat to the

employees.  Given Prieto's behavior, it would not have been reasonable for the officers to wait and see whether Prieto could get in through the double doors.  Use of deadly force at that point was reasonable as a matter of law, irrespective of less lethal options.[26]  See Wilkinson, 610 F.3d at 551; Gregory, 523 F.3d at 1107; Forrester, 25 F.3d at 807.  The evidence does not support actionable negligence under this theory.

Fifth, Plaintiffs contend that Hall and Dowling were negligent for not properly communicating as to the availability of less lethal options.  As the Court has explained, Prieto's conduct and attempts to enter the plant/break room area made him a real and imminent threat to those inside.  The officers, as well as the Foster Farms employees, had real and legitimate fears about what Prieto would do if he managed to enter the plant.  Because Prieto was at the doors and attempting to enter, use of deadly force was reasonable, irrespective of any less lethal option available or communication about less lethal options.[27]  See Wilkinson, 610 F.3d at 551; Gregory, 523 F.3d at 1107; Forrester, 25 F.3d at 807.  The evidence does not establish actionable negligence under this theory.

Because the evidence does not show that Hall and Dowling were negligent with respect to Prieto and their pre-shooting tactics, summary judgment on Plaintiffs' negligence claim is appropriate.[28]  Brown, 171 Cal.App.4th at 535-38; Lindstrom, 81 Cal.App.4th at 652.


**CONCLUSION**

With respect to the Fourth Amendment claim against Hall for his initial single shot against Prieto, summary judgment is appropriate.  The crimes involved, Prieto's failure to

---

[26]Further, Linley and Weakley's testimony indicate that the bean bag rounds were ineffective.

[27]To the extent that Plaintiffs may be referring to Maniss and his K-9 unit, Maniss's testimony establishes that use of the K-9 unit was not a viable option.

[28]The City is also a named defendant under this cause of action through application of the vicarious liability provision of California Government Code § 815.2.  However, an employer cannot be held vicariously liable unless the employee is found responsible/liable, and a finding that exonerates the employee also exonerates the employer. See Lathrop, 114 Cal.App.4th at 1423; Perez, 7 Cal.App.4th at 819-20 (1992); Davison, 10 Cal.App.2d at 221-224. Because Hall and Dowling were not negligent, the City cannot be vicariously liable for negligence. See id.; Davis v. Pine Mtn. Lumber Co., 273 Cal.App.2d 218, 227 (1969).

comply with commands, Prieto's behavior, Hall's position in front of an entrance, and Prieto's advancing on Hall with the screwdriver made Hall's single gun shot reasonable.  Alternatively, the law was not so clearly established that, given the facts confronting Hall, a reasonable officer in his position would know that the single shot violated the Fourth Amendment.

With respect to the fatal shots by Hall and Dowling, summary judgment is appropriate. The crimes involved, Prieto's failure to comply with commands and warnings, Prieto's behavior, the presence of employees in the plant/break room area, Prieto's attempts to enter the double doors, and Prieto's possession of the screwdriver, made Hall's and Dowling's gun shots reasonable.  Alternatively, the law was not so clearly established that, given the facts confronting Hall and Dowling, a reasonable officer in their position would know that the gun shots violated the Fourth Amendment.

With respect to the Fourteenth Amendment claim, summary judgment is appropriate. The Fourteenth Amendment and the Fourth Amendment claims are intertwined.  The evidence shows reasonable conduct by the police, and does not indicate an intent to harm that is unrelated to legitimate law enforcement objectives.

With respect to the *Monell* claim, Plaintiffs have withdrawn this claim.  Additionally, in the absence of a constitutional violation, there is no *Monell* liability.  Therefore, summary judgment as to this claim is appropriate.

With respect to the state law battery claim, a battery claim is a state tort counterpart to a Fourth Amendment excessive force claim.  Because there was no excessive force and the officers acted reasonably, there is no liability for state law battery.  Therefore, summary judgment as to this claim is appropriate.

With respect to state law negligence for the officers' pre-shooting conduct, the Court assumes without deciding that Hall and Dowling owed Prieto a duty of due care regarding pre-shooting tactics.  However, the five acts/courses of conduct identified by Plaintiffs are insufficient to establish negligence by Hall and Dowling.  Therefore, summary judgment as to this claim is appropriate.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion of summary judgment is GRANTED in favor of Defendants on all claims, and the Clerk shall CLOSE this case.

IT IS SO ORDERED.

Dated:    July 5, 2011    _____
                              CHIEF UNITED STATES DISTRICT JUDGE